. JAMES B. STEVENSON, Trustee,

*vs.*

THE MILLIKEN, TOMLINSON COMPANY.

SAME *vs.* THE TWITCHELL-CHAMPLIN COMPANY.

·SAME *vs.* J. H. FLETCHER, et ·als.

Oxford.     Opinion December 5, 1904.

*Bankruptcy. Preference. Evidence. Bankrupt Act 1867. Bankrupt Act 1898,*
*§ 1, clause 15, § 60 a, § 60 b.*

Under the Bankrupt Act of 1867 the term insolvency was construed to mean an inability to meet one's obligations in the ordinary course of business, while in the present act it is equivalent to the word bankruptcy in the former statute; but the principles of construction laid down by the courts in determining the force and effect to be given to the phrase "reasonable cause to believe," found in the former act relating to preferences, are equally applicable in considering the meaning of this phrase in the act of 1898.

It is not enough that a creditor has some cause to suspect the insolvency of his debtor, but he must have such a knowledge of facts as to induce a reasonable belief of his debtor's insolvency, in order to invalidate a security taken for his debt.

In the case at bar the evidence fails to disclose the existence of any desire or purpose on the part of the bankrupts to give the defendants any advantage over other creditors, or that the defendants had reasonable cause to believe that it was intended thereby to give them a preference.

On report.     Judgment for the defendants.

Three actions brought by the plaintiff as trustee in bankruptcy to recover certain payments made to the defendants by the bankrupts, which payments the plaintiff alleged to be preferences under the Bankrupt Act of 1898.     The three actions were tried together and by agreement of the parties are reported to the law court to render

such judgment in each case, upon so much of the evidence as is legally admissible, as the legal rights of the parties require.

Further facts appear in the opinion.

*J. B. Stevenson*, for plaintiff.

*J. S. Wright*, for defendants.

SITTING: WISWELL, C. J., WHITEHOUSE, STROUT, SAVAGE, PEABODY, SPEAR, JJ.

WHITEHOUSE, J. These three actions were brought by the plaintiff as trustee in bankruptcy of the firm of Voter & Wing of Rumford Falls to recover the amount of certain notes alleged to have been accepted by the defendants in payment of their respective claims as creditors of Voter & Wing, under circumstances which rendered the transactions voidable as preferences under the Bankrupt Act of 1898. As the same question was raised in each suit and must be determined with reference to the same facts, the cases were heard together and the evidence presented in a single report.

The partnership of Voter & Wing, composed of Clarence P. Voter and A. W. Wing, was engaged in the business of retail grocers at Rumford Falls from May 1st to September 15, 1902. At the time the firm commenced business it gave to Morrell Wing, the father of A. W., a mortgage of its entire stock and fixtures to secure the sum of $1,000; and it appears from the testimony of Clarence P. Voter, a witness for the plaintiff, that the genuineness of this mortgage was never questioned by the firm in any of its negotiations with the defendants, it being uniformly represented that it was a mortgage for $1,000. It appears that September 15, 1902, the firm was owing Milliken, Tomlinson Company $446.28, the Twitchell-Champlin Company $272, and J. H. Fletcher & Company $326.20, but neither of the defendants had refused to fill the orders of Voter & Wing, payments on account of goods purchased being overdue only a month or six weeks. In addition to these large claims, however, the firm owed James S. Morse $103.15, and smaller amounts to several other creditors, and it is not in controversy that at that time the firm was unable to meet all of its liabilities as they matured in the ordinary course of business.

VOL. XCIX  21

Under these circumstances the firm of Voter & Wing gave to Perry C. Lapham, who had been employed as a clerk in the store, a bill of sale of the entire stock and fixtures dated September 15, 1902, in consideration of an agreement on his part to assume the payment of the mortgage given by the firm to Morrell Wing May 1st, 1902, and the firm's indebtedness to the defendants and James S. Morse. The next day, September 16, A. W. Wing went to Portland and informed the defendants of this sale to Lapham. A. T. Laughlin, president of the defendant corporation of Milliken, Tomlinson Company, testifies as follows, inter alia, in relation to the interview between Wing and himself:

"He said that he wanted to dissolve the firm of Voter & Wing. He stated at that time that his reasons for wanting to dissolve the firm were that Mr. Voter had borrowed money from his mother and was endeavoring to pay it back out of the concern, and that they were not in a position to do it; that they were also taking goods out of the store, and he didn't want to do it; that they put in this capital and he wanted it to remain there, but that Mr. Voter was letting his mother run a bill, etc. He said he wanted to go on in the business alone, or he wanted Mr. Lapham to have the business and go on with it, as it was a good business, and he wanted to get out of it. That was the idea. He stated that he had made arrangements with Mr. Lapham to buy the stock of goods, assume the mortgage that was due his father of a thousand dollars, and assume four other bills, including Milliken, Tomlinson Co., The Twitchell-Champlin Co., and Fletcher & Co., and another man in Rumford Falls, provided they would agree to it; that the stock of goods amounted to $2200 and the mortgage and the four bills which Lapham would assume amounted to about $2000. He further said that he had some other small creditors—these were the large creditors—and that there was enough on the book accounts to more than take care of the other creditors, and that he thought the easiest way to close up the firm of Voter & Wing was to sell to Mr. Lapham, take care of his large creditors in this way and collect his book accounts and pay little bills; and that that was his idea in making this transfer. He came to my place first, and we went to the Twitchell-Champlin Co., and talked it

over with Mr. Pitt. They agreed to it. We went to Mr. Fletcher's, and they agreed to it. He stated at that time that there was a good business at Rumford Falls, and that the store was doing a nice business; that Mr. Lapham, to whom he had sold, a very fine young man, entirely responsible, and that we were taking no risk whatever, and it was a good sale. He told us a very plausible story, and we agreed to it. He represented that his firm was entirely solvent."

Mr. Laughlin further testifies that these statements were substantially repeated by Mr. Wing, or by himself in Wing's presence, in the conversations held with the other defendants. The arrangement accordingly proposed by Mr. Wing was that each of the defendants should accept Lapham's note, indorsed by himself, for the amount of its claim against the firm of Voter & Wing. The defendants finally assented to the proposition and accepted Lapham's notes with Wing's indorsement in settlement of their respective claims. Receipts bearing date October 6, 1902, signed by Milliken, Tomlinson Co., and Fletcher & Co., respectively, discharging all claim and right of action against Voter & Wing, appear in evidence. James S. Morse declined to assent to the proposition and did not accept Lapham's note in settlement of his claim.

September 17, 1902, Voter & Wing made an assignment to Swasey & Swasey for the benefit of creditors, in order that the accounts due the firm might be collected and the amount realized therefrom be applied to the payment of the small debts which Lapham had not assumed.

October 9, 1902, Clarence P. Voter filed his petition in bankruptcy individually and as a member of the firm of the copartnership of Voter & Wing, and on the same day the partnership was adjudicated bankrupt. In the partnership schedule, under the title of unsecured creditors, appears the name of Morrill Wing as a creditor to the amount of $1000 secured by a mortgage of the firm's stock in trade, contracted "on or about May 7, 1902." The number of unsecured creditors is thirty, their claims aggregating the sum of $3344.11. In the schedule of the assets of the firm it is said: "There are debts due the partnership of $1000. This may reach $1500." . . . "Stock in trade sold Perry C. Lapham who

assumed the partnership debts in payment thereof to the amount of $2157.63." With reference to the book account, however, the plaintiff testifies that it would be utterly impossible to realize from that source more than $250 or $300.

In the meantime Perry C. Lapham had taken possession of the stock of goods by virtue of his bill of sale of September 15, and continued to carry on the business under the name of the "Rumford Falls Grocery Company" until January 21, 1903. The defendants continued to supply the store with goods on credit until that date, but received no payments on the notes given for their claims against Voter & Wing. Mr. Laughlin for Milliken, Tomlinson Co., and Mr. Pitt, the "credit man" of Twitchell-Champlin Co., thereupon had an interview with Lapham at Rumford Falls which resulted in a sale from Lapham to Laughlin of the entire stock in trade and fixtures, together with Lapham's book accounts, in consideration of Laughlin's agreement to assume the Morrell Wing mortgage, pay all outstanding debts against Lapham and relieve him from all liability on account of the notes given to the defendants in settlement of their claims against Voter & Wing. From the sale of the stock of goods and from the book accounts Mr. Laughlin realized $1419.70. He purchased the Morrell Wing mortgage for $500, and paid other bills to the amount of $545.34, leaving a balance of $364.36 to be appropriated to the payment of the three notes given to the defendants on account of Voter & Wing.

Upon these facts the defendants contend that no preference to them was ever given or intended by the firm of Voter & Wing, or if so, that they did not have reasonable cause to believe that the firm intended to give them a preference.

The provisions of the Bankrupt Act of 1898, pertinent to the question thus presented, are as follows:

(Section 1, clause 15) "A person shall be deemed insolvent within the provisions of this act whenever the aggregate of his property, exclusive of any property which he may have conveyed, transferred, concealed, or removed, or permitted to be concealed or removed, with intent to defraud, hinder or delay his creditors, shall not, at a fair valuation, be sufficient in amount to pay his debts."

(Section 60 a)   "A person shall be deemed to have given a preference if, being insolvent, he has procured or suffered a judgment to be entered against himself in favor of any person, or made a transfer of any of his property, and the effect of the enforcement of such judgment or transfer will be to enable any one of his creditors to obtain a greater percentage of his debt than any other of such creditors of the same class."

(Section 60 b)   "If a bankrupt shall have given a preference within four months before the filing of a petition, or after the filing of the petition and before the adjudication, and the person receiving it, or to be benefitted thereby, or his agent acting therein, shall have had reasonable cause to believe that it was intended thereby to give a preference, it shall be voidable by the trustee, and he may recover the property or its value from such person."

The amendments to these sections adopted February 5, 1903, are not involved in this case.

Although the evidence tends strongly to show that at the time of their transfer to Lapham of September 15, Voter & Wing did not consider the firm insolvent within the definition above quoted from the Bankrupt Act, it must be admitted that in light of subsequent developments the firm was in fact insolvent at that time, and whatever may have been the intention of the firm respecting that transfer it cannot be denied that the transactions above recited resulted indirectly in a transfer of a larger part of the property of the firm for the benefit of the defendants, the effect of which was to enable them to obtain a greater percentage of their debts than any other of such creditors of the same class.   But whether upon the facts and circumstances known to the defendants and their agents September 16, 1902, or which might have been ascertained by them by the exercise of reasonable diligence on their part, the defendants had reasonable cause to believe that a preference was thereby intended, is a question the solution of which is not entirely free from difficulty.

Under the act of 1867 the term insolvency was construed to mean an inability to meet one's obligations in the ordinary course of business, while in the present act it is equivalent to the word bankruptcy in the former statute; but the principles of construction laid down

by the courts in determining the force and effect to be given to the phrase "reasonable cause to believe," found in the former act relating to preferences, are equally applicable in considering the meaning of this phrase in the section 60a above quoted from the act of 1898. In the leading case of *Grant* v. *Bank*, 97 U. S. 80, it was said:

"It is not enough that a creditor has some cause to suspect the insolvency of his debtor, but he must have such a knowledge of facts as to induce a reasonable belief of his debtor's insolvency, in order to invalidate a security taken for his debt.    To make mere suspicions a ground of nullity in such a case would render the business transactions of the community altogether too insecure.    It was never the intention of the framers of the act to establish any such rule.    A man may have many grounds of suspicion that his debtor is in failing circumstances, and yet have no cause for a well-founded belief of the fact.    He may be unwilling to trust him further, he may feel anxious about his claim and have a strong desire to secure it, and yet such belief as the act requires may be wanting.    Obtaining additional security or receiving payment of a debt under such circumstances is not prohibited by the law.    Receiving payment is put in the same category, in the section referred to, as receiving security.    Hundreds of men constantly continue to make payments up to the very eve of their failure, which it would be very unjust and disastrous to set aside.    And yet this could be done in a large proportion of cases if mere grounds of suspicion of their solvency were sufficient for the purpose.    The debtor is often buoyed up by the hope of being able to get through with his difficulties long after his case is in fact desperate, and his creditors, if they know anything of his embarrassments, either participate in the same feeling, or at least are willing to think that there is a possibility of his succeeding.    To overhaul and set aside all his transactions with his creditors, made under such circumstances, because there may exist some grounds of suspicion of his inability to carry himself through, would make the bankrupt law an engine of oppression and injustice.    It would in fact have the effect of producing bankruptcy in many cases where it might otherwise be avoided."    See also *Barbour* v. *Priest*, 103 U. S. 293; *Stucky* v. *Bank*, 108 U. S. 746.    But in *Dutcher* v. *Wright*, 94 U. S. 553, it

is said: "If it appears that the debtor giving the preference was actually insolvent, and that the means of knowledge were at hand, and that such facts and circumstances were known to the creditor securing the preference as clearly ought to have put a prudent man upon inquiry, it must be held that he had reasonable cause to believe that the debtor was insolvent, if it appears that he might have ascertained that fact by reasonable inquiry." See also *Bank* v. *Cook,* 95 U. S. 343.

In re Eggert, 102 Fed. Reporter 735, the question of a preference under the present act was under consideration; and after comparing the cases above cited, the court say: "The resultant of all these decisions we take to be this: That the creditor is not to be charged with knowledge of his debtor's financial condition from mere non-payment of his debt, or from circumstances which give rise to mere suspicion in his mind of possible insolvency; that it is not essential that the creditor should have actual knowledge of, or belief in, his debtor's insolvency, but that he should have reasonable cause to believe his debtor to be insolvent; that if facts and circumstances with respect to the debtor's financial condition are brought home to him, such as would put an ordinarily prudent man upon inquiry, the creditor is chargeable with knowledge of the facts which such inquiry should reasonably be expected to disclose. . . . The only fact brought home to the creditor, and which it is claimed should have aroused inquiry, is that he was somewhat behind in the prompt payment of his obligation. We cannot say, as a conclusion of law, that knowledge of that fact standing alone was sufficient to put the creditor upon inquiry. Indeed it may be said that a majority of merchants absolutely solvent, in the sense in which the term is employed in the Bankrupt Act, are not at all times able to promptly meet their obligations as they mature. To hold that a creditor receiving payment of or security for a past due debt is, by the mere fact of knowledge that the debt is past maturity, put upon inquiry of his debtor's inability to pay all his debts, and that under such circumstances he received payment or security at his peril, would be to put at hazard many business transactions and make the act oppressive. The fact of such inability, coupled with other facts and circumstances brought

home to the creditor, might be sufficient to put him on inquiry; but this is the only fact from which the deduction is sought that the creditor had reasonable cause to believe his debtor insolvent, and, standing alone, it is insufficient to raise an inference of law that the creditor is chargeable with knowledge of the facts which inquiry would have elicited."

In the case at bar the evidence fails to disclose the existence of any desire or purpose on the part of Voter & Wing to give the defendants any advantage over other creditors. The defendants had shown no anxiety about their claims. They had made no effort to enforce the collection of them or obtain security for them. Perfunctory requests for further payments had been made by their agents, but the defendants continued to give further credit. The transfer to Lapham of September 15th was made without the suggestion or knowledge of any of the defendants or their agents. Mr. Wing went to Portland and proposed the arrangement which was made with the defendants September 16th, not in pursuance of any request from them, but by reason of a desire on his own part to effect a dissolution of the firm. The defendants had no knowledge respecting the financial standing of the firm except that arising inferentially from a failure to make prompt payment of all obligations at maturity, and were not in a state of mind to question the confident assurance of Mr. Wing that "the firm was entirely solvent," and that there was enough on the book accounts, not included in the sale to Lapham, to take care of all the other creditors. It appears from the testimony of Mr. Lapham, called as a witness for the plaintiff, that he purchased the stock in good faith for the purpose of carrying on the business, and that according to the account taken at that time the property transferred to him was sufficient to pay in full all of the liabilities which he proposed to assume, including Morse's claim of $103.15, and he was assured by the firm that the book accounts were ample to pay all other bills. And in this connection it may be observed that if Mr. Laughlin had been compelled to pay the full value of the Wing mortgage, as it was understood by all of the parties and as stated in the schedule of secured claims, the balance realized by him from the sale of the property would have been insuf-

ficient to pay the liabilities assumed by him, and there would have been nothing whatever to apply to the payment of the defendant's notes. Again, if the firm's book accounts had possessed the value which Voter & Wing and Mr. Lapham evidently believed that they had, or the minimum value stated in the schedule of assets, the defendants, with a balance in their favor of $364.36, would have obtained a less percentage on their debts than the other creditors.

Mr. A. W. Wing was not called as a witness, and the testimony of Mr. Laughlin, corroborated as it is by that of Mr. Pitt and of Mr. Lapham, remains unquestioned and substantially unmodified by any other evidence in the case.

It is accordingly the opinion of the court that the evidence reported does not warrant the conclusion that at the time the defendants accepted Lapham's notes, in settlement of their claims against Voter & Wing, they had reasonable cause to believe that it was intended thereby to give them a preference.

The entry in each case will therefore be,

*Judgment for the defendant.*